The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 30, 2020

**2020COA116**

**No. 16CA1894, *Peo v Lowe* — Crimes — Resisting Arrest;**

**Criminal Law — Prosecution of Multiple Counts for Same Act;**

**Constitutional Law — Fifth Amendment — Double Jeopardy —**

**Multiplicity**

A division of the court of appeals considers an issue of first

impression in Colorado: the unit of prosecution for the resisting

arrest statute, *see* § 18-8-103(1), C.R.S. 2019.  Based on the plain

language of the statute, the division holds that the unit of

prosecution for resisting arrest is the number of discrete volitional

acts of resisting arrest.  Accordingly, the division concludes that

defendant's resisting arrest convictions must merge.

The division also remands for the district court to disclose

police personnel and internal investigation files and to allow

defendant to attempt to make the requisite showing of prejudicial error, and to otherwise correct the mittimus as instructed.

COLORADO COURT OF APPEALS                                      **2020COA116**

Court of Appeals No. 16CA1894
El Paso County District Court No. 15CR2226
Honorable Lin Billings Vela, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Brian Douglas Lowe,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE FOX
Brown and Rothenberg*, JJ., concur

Announced July 30, 2020

Philip J. Weiser, Attorney General, Megan C. Rasband, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Nathaniel E. Deakins, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1　　Brian Douglas Lowe appeals the judgment of conviction entered on jury verdicts finding him guilty of two counts of attempted murder in the second degree, two counts of first degree assault of a peace officer, two counts of resisting arrest, two counts of menacing, and prohibited use of a stun gun.

¶ 2　　Lowe claims that the trial court erred by (1) refusing to disclose police personnel and internal investigation files; (2) allowing the prosecution's fingerprint comparison witness to be qualified as an expert; (3) relying upon Lowe's prior escape conviction in adjudicating him a habitual criminal; (4) failing to merge Lowe's two resisting arrest convictions; and (5) imposing consecutive sentences for his first degree assault convictions. We affirm in part, reverse in part, and remand with instructions.

## I.　Background

¶ 3　　In May 2015, the El Paso County Sheriff's Office was asked to locate and apprehend Lowe after he escaped from parole supervision and a warrant for his arrest was issued.

¶ 4　　Lieutenant Robert Shane Mitchell and Sergeant Keith Duda responded to a Hobby Lobby in Colorado Springs after the officers

1

were informed that Lowe was there.[1]  When the officers approached

Lowe and informed him that he was under arrest, he was using the

floral department's telephone.  When Duda moved to handcuff

Lowe, Lowe resisted.  Mitchell attempted to use a taser on Lowe, but

during the struggle, Lowe obtained the taser.  Both officers testified

that, during the scuffle, they saw Lowe holding a knife.[2]  The

altercation ended when Mitchell shot Lowe three times; Mitchell

later testified that he feared Lowe was going to stab Duda, who had

fallen to the ground during the struggle.

¶ 5      After a June 2016 jury trial, Lowe was found guilty as charged

except the jury acquitted Lowe of two counts of second degree

assault of a peace officer.[3]  Following the trial, a hearing was held

where Lowe was adjudicated a habitual criminal.  At the sentencing

hearing, the court sentenced Lowe to two consecutive

---

[1] In May 2015, Lieutenant Robert Shane Mitchell was a Sergeant and Sergeant Keith Duda was a Deputy with the El Paso County Sheriff's Office.

[2] Testimony at trial established that, after the shooting and once other officers had arrived on scene, Lowe was laying on the ground handcuffed and near him was a pocketknife with the blade extended.

[3] Lowe was charged with two counts each of first and second degree assault of a peace officer.

sixty-four-year prison terms in the Department of Corrections' custody for the first degree assault convictions. Lowe was sentenced concurrently for his remaining convictions. Lowe appeals.

## II.    Disclosure of Mitchell's and Duda's Personnel Files

¶ 6    Lowe first argues that the trial court erred by refusing to disclose Mitchell's and Duda's personnel and internal investigation files. After conducting our own review of the files, we conclude that certain records from Mitchell's files should have been disclosed to Lowe.

## A.    Additional Background

¶ 7    Before trial, Lowe's counsel served a subpoena duces tecum on the El Paso County Sheriff's Office to produce "personnel and internal affairs files" for Duda and Mitchell, including any allegations of misconduct, mishandling evidence, dishonesty, and excessive use of force. The Sheriff's Office provided the court with Mitchell's and Duda's professional and personnel files for in camera review. The Sheriff's Office also provided the prosecution certain records regarding the officers' use of force to release to the defense through discovery. Because part of that record involved the use of

force on a juvenile, the Sheriff's Office asked the court to determine what portion of the record, if any, should be released with a protection order.

¶ 8 After conducting an in camera review, the court declined to release the files. The court ruled that none of the files were relevant to Lowe's case, finding that "[a]ny relevancy of the reviewed records from [the Sheriff's Office] is remote and speculative at best." The court also found that the officers' privacy expectation outweighed Lowe's interest in disclosure; therefore, the court denied the release of any of Mitchell's or Duda's records.

B. Applicable Law and Standard of Review

¶ 9 There is no general constitutional right to discovery in a criminal case. *People v. Dist. Court*, 790 P.2d 332, 338 (Colo. 1990). However, the prosecution must provide to the defense any evidence that is favorable to the accused and material to the guilt or punishment of the accused. *Brady v. Maryland*, 373 U.S. 83, 88 (1963).

¶ 10 Under Crim. P. 16, a criminal defendant is entitled to discovery of material and information in the possession or control of law enforcement. Crim. P. 16(1)(a)(3); *see also People v. Gallegos*,

644 P.2d 920, 924 (Colo. 1982) (recognizing that Crim. P. 16 embodies a broad standard of disclosure, where information that would be inadmissible at trial may still be relevant, as long as the content of the information is relevant to the defense's conduct). Specifically, the prosecution must disclose exculpatory evidence to the defense, meaning evidence that is material: "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *People v. White*, 64 P.3d 864, 874 (Colo. App. 2002) (quoting *People v. Wilson*, 841 P.2d 337, 339 (Colo. App. 1992)); *see also People v. James*, 40 P.3d 36, 49 (Colo. App. 2001) ("Exculpatory evidence includes evidence that bears on the credibility of a witness the prosecution intends to call at trial.").

¶ 11     At the same time, our supreme court has recognized that police officers have a right to privacy in their personnel files. *See People v. Spykstra*, 234 P.3d 662, 670 (Colo. 2010). To obtain disclosure of such files, a defendant must "make a greater showing of need." *Id.* Thus, a police officer's expectation of privacy may be overridden by "the state's compelling interest in the determination of the truth and safeguarding of the defendant's right to exculpatory

5

evidence." *People v. Walker*, 666 P.2d 113, 122 (Colo. 1983); *see also Martinelli v. Dist. Court*, 199 Colo. 163, 174, 612 P.2d 1083, 1091 (1980) (holding that when a party seeks disclosure of confidential personal information, the trial court must conduct a balancing inquiry, asking whether disclosure is required to serve a "compelling state interest" despite a party's legitimate privacy expectation). When conducting an in camera review, a trial court may not draw a distinction between sustained and unsustained complaints. *Walker*, 666 P.2d at 122. And a defendant who is charged with assaulting a police officer is entitled to disclosure of complaints charging excessive use of force filed against that officer. *Id.* at 121-22.

¶ 12     When a defendant challenges a trial court's ruling denying access to records, we conduct an independent review of the records to determine whether any should have been disclosed. *People v. West*, 2019 COA 131, ¶ 31. But, we review a trial court's resolution of discovery issues for an abuse of discretion. *People in Interest of A.D.T.*, 232 P.3d 313, 316 (Colo. App. 2010).

¶ 13     If the trial court abused its discretion by failing to disclose certain documents, the proper remedy is to remand the case to the

trial court with instructions to provide the documents to the parties. *Zoll v. People*, 2018 CO 70, ¶ 12. On remand, the trial court must allow the defendant an opportunity to "demonstrate a reasonable probability that, had the documents been disclosed before trial, the result of the proceeding would have been different." *Id.*

### C. Analysis

¶ 14 Lowe contends that the trial court erred by refusing to disclose any of Duda's and Mitchell's files. Because Duda's and Mitchell's testimony was the prosecution's only evidence that Lowe threatened the officers with a knife, and the officers' credibility was central to Lowe's defense, he contends that he was prejudiced by the lack of disclosure. We agree in part.

¶ 15 After reviewing Duda's sealed personnel and internal investigation files, we agree with the trial court that Lowe's interest in obtaining exculpatory information does not outweigh Duda's privacy interest because Duda's files contain no relevant or material information. *See White*, 64 P.3d at 874. However, after reviewing Mitchell's sealed files, particularly reviewing for complaints against Mitchell charging excessive use of force and challenging Mitchell's

credibility, *see James*, 40 P.3d at 49, we conclude that the following records relate to Mitchell's credibility and should have been disclosed:

(1)    documentation from a professional misconduct investigation initiated in August 2000 based, in part, on an allegation that Mitchell falsified reports;

(2)    documentation from a professional misconduct investigation based on an October 7, 2000, incident alleging that Mitchell failed to report the use of force and then embellished the facts of the incident, and the complaint was deemed sustained;

(3)    documentation from an internal investigation based on an October 14, 2000, incident and citizen complaint, where it was determined that Mitchell made false statements and he failed to fully investigate an incident;

(4)    documentation from an internal investigation initiated in 2001 based on a citizen complaint, where Mitchell's supervisors stated during a performance review that Mitchell incorrectly documented incident reports and embellished facts;

(5)    documentation from an internal investigation initiated in 2004 for departure from the truth, and the allegation was deemed unfounded, *see Walker*, 666 P.2d at 122; and

(6)    documentation from an internal investigation initiated in 2010 based on a citizen complaint, where it was alleged that Mitchell falsified information in an incident report and the allegation was deemed unfounded, *see id.*[4]

¶ 16    Because Lowe disputes Mitchell's account of his arrest — mainly, that Lowe threatened the officers with a knife, and the officers' testimony was the prosecution's principle evidence on the issue — these discoverable files were relevant and material to Lowe's defense. *See id.* at 121-22; *White*, 64 P.3d at 874; *James*, 40

---

[4] Examples of such documentation are found on the sealed, unredacted CD labeled, "Sgt. Shane Mitchell," on the following pdfs: "Request to remove corrective action.pdf," pages 4-7; "01-13 Complete.pdf," pages 100-01; and "11-64 Complete.pdf," pages 318-19. We do not suggest that this list includes all documents falling within the six identified categories; the district court must conduct its own review on remand to ensure all relevant documents are properly disclosed. The source documents for certain investigative proceedings are not in the files provided to us on appeal. Because the record contains no information concerning the Sheriff's Department's document retention policies, we cannot speculate about why certain documents were provided to us and others were not. We base our disclosure order only on those documents that are before this division.

P.3d at 49*; see also Scherbarth v. Woods*, No. 16-CV-2391-KHR, 2018 WL 851344, at *4 (D. Colo. Feb. 13, 2018) ("The court finds that because Defendants' credibility is at issue in the excessive force claim, Plaintiff has shown sufficient need for potential impeachment evidence from Defendants' personnel and internal investigation files to outweigh Defendants' privacy interest."); *Zoll*, ¶ 11 (recognizing that "an appellate court cannot review the improperly withheld documents with an advocate's eye," especially where "the case turns on the witnesses' credibility and the undisclosed information relates directly to the credibility of the prosecution's primary witness"). But any incident relating to insubordination or abuse of authority while off-duty are not subject to disclosure because Lowe does not dispute that he resisted arrest or that Mitchell had the right to arrest him. *See James*, 40 P.3d at 50 ("Our review of the sealed information reveals that the information was not likely to have exculpated defendant or have provided impeaching material concerning prosecution witnesses.").

¶ 17    Accordingly, we conclude that the trial court abused its discretion by not disclosing to the defense information in Mitchell's personnel and internal investigation files where it was found, or

alleged, *see Walker*, 666 P.2d at 122, that Mitchell misreported information, departed from the truth, or embellished facts, *see People in Interest of A.D.T.*, 232 P.3d at 316. In deciding that the subject materials were discoverable to the defense we do not decide, however, how the trial court would have ruled on their admissibility at trial or what protections or redactions the trial court may require on remand.

¶ 18    We remand for trial court to disclose to Lowe's counsel the previously referenced information (subject to any redactions the court deems appropriate) and any other documentation where it was alleged or reported that Mitchell misreported information, departed from the truth, or embellished facts. *See Zoll*, ¶ 12. On remand, the trial court should allow Lowe to attempt to make the requisite showing of prejudicial error. *See id.* If the trial court concludes there is a reasonable probability that the result of the trial would have been different, then it must grant Lowe a new trial; but, if the trial court finds no such reasonable probability exists, then it may leave in place its judgment of conviction, subject to Lowe's right to appeal. *See id.*

### III.   Habitual Criminal Hearing

¶ 19    Lowe next argues that the trial court erred during the habitual criminal hearing by (1) allowing the prosecution's fingerprint comparison witness to be qualified as an expert and (2) relying on Lowe's prior escape conviction in adjudicating him a habitual criminal.

### A.   Additional Background

¶ 20    The People's complaint alleged six habitual criminal counts for Lowe's prior felony convictions: escape, aggravated motor vehicle theft, second degree introduction of contraband, aggravated robbery, first degree aggravated motor vehicle theft, and vehicular eluding.[5]  After Lowe's jury trial, the court held a habitual criminal hearing to determine whether Lowe had previously been brought, tried, and convicted of multiple felony offenses.

¶ 21    During the hearing, the prosecution offered testimony by Phillip Donner, an investigator for the District Attorney's Office, and asked that he be qualified as an expert in fingerprint comparison.

---

[5] The complaint alleged six habitual criminal counts, but during the habitual criminal hearing the prosecution dismissed the habitual count for Lowe's prior vehicular eluding conviction.

12

Regarding his training and experience, Donner testified that he had completed a sixteen-hour class with Jeff Saviano — a fingerprint examination instructor who attended a fingerprint examination course hosted by the Federal Bureau of Investigation — over a month-long period in April 2011. Donner also testified that he had done at least seventy-three fingerprint comparisons and had been qualified as an expert in fingerprint comparison thirteen times.

¶ 22 During defense counsel's voir dire examination, it was established that, while Donner had attended several informal training review classes since 2011, he had no nationally recognized certifications other than his 2011 certification, he had not published papers related to fingerprint comparisons nor taught certified courses in forensic fingerprint testing, and he had not been tested to determine his error rate in fingerprint comparisons. However, Donner also testified that after he does a fingerprint comparison, another person does an independent comparison to verify his finding, and he had never been advised that he had mismatched fingerprints.

¶ 23 The trial court ruled that Donner could be qualified as a fingerprint comparison expert under CRE 702 because

Donner has had specific technical and specialized training in the area of fingerprint analysis consisting of a 16-hour [class where] . . . Donner learned not only about the history of fingerprints, the classification of fingerprints, but more relevant to this case, the specific ability to make analyses of fingerprint comparisons based on that training . . .[;] he has continued to engage in what I will refer to as peer reviews and continuing to review the techniques that he was certified in in his 2011 class; [and] the District Attorney's Office employs a practice for review of an investigator's fingerprint analysis for purposes of assurance of the process. . . .  So the Court finds based on that this is a reliable, scientific process; that it is relevant to the identification issues before the Court; that it would be helpful for the Court to hear an expert with regards to fingerprint comparison as to this one element of the habitual criminal findings required by the Court.

¶ 24    As the People's expert, Donner testified that he obtained Lowe's fingerprints on a fingerprint card and then compared that card with fingerprint cards previously taken from Lowe in connection with his prior felony convictions, and the fingerprints matched.

¶ 25    After the prosecution's evidence presentation, the trial court found that the People had proved beyond a reasonable doubt that Lowe had five prior felony convictions, including a prior escape

14

conviction. Thus, the court concluded that Lowe would be sentenced as a habitual criminal.

## B. Expert Testimony

### 1. Preservation and Standard of Review

¶ 26 We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Relaford*, 2016 COA 99, ¶ 25. An abuse of discretion occurs when a trial court's ruling was manifestly arbitrary, unreasonable, or unfair, or if it misapplied the law. *Id.*

¶ 27 After the defense's voir dire of Donner, Lowe's counsel objected to his testimony, albeit not on specific grounds. Generously construing Lowe's objection, we review for harmless error. *See Yusem v. People*, 210 P.3d 458, 469 (Colo. 2009). Under this standard, any erroneous admission of evidence requires reversal unless there is no reasonable probability that it contributed to Lowe's conviction by substantially influencing the verdict or impairing the fairness of the trial. *Id.*

### 2. Law and Analysis

¶ 28 CRE 702 governs the admissibility of expert testimony and allows qualified experts to testify at trial when their "specialized knowledge will assist the trier of fact to understand the evidence or

to determine a fact in issue." *See also People in Interest of Strodtman*, 293 P.3d 123, 129-30 (Colo. App. 2011) (recognizing that under CRE 702's "broad" and "liberal" standard, a trial court may admit expert testimony "if the witness can offer 'appreciable' assistance on a subject beyond the understanding of an 'untrained layman'") (citation omitted). And a trial court has broad discretion to determine the admissibility of expert testimony. *Golob v. People*, 180 P.3d 1006, 1011 (Colo. 2008); *see also People v. Williams*, 790 P.2d 796, 798 (Colo. 1990) ("This deference reflects the superior opportunity of the trial judge to gauge both the competence of the expert and the extent to which his opinion would be helpful to the jury.") (citation omitted). When an expert's testimony is scientific in nature, the evidence must be relevant and reliable to be admitted. *People v. Ramirez*, 155 P.3d 371, 378 (Colo. 2007). A trial court must make specific findings concerning reliability and relevance before admitting CRE 702 testimony. *Ruibal v. People*, 2018 CO 93, ¶ 13.

¶ 29    Lowe argues that the trial court abused its discretion by qualifying Donner as an expert because Donner had (1) minimal training, comprised of one class held years before his testimony; (2)

16

undergone no formal testing after April 2011; (3) no nationally recognized certification or specialized licensing for fingerprint examiners; (4) neither published nor taught classes on fingerprint comparison; and (5) never been tested to determine his error rate in fingerprint comparisons outside of the April 2011 class and test.[6]

¶ 30     We conclude that the trial court did not abuse its discretion by qualifying Donner as an expert, and we reject Lowe's comparison to *Williams*, 790 P.2d at 798 (affirming the trial court's refusal to qualify the defense's witness as an expert in analytical chemistry and firearms identification).

¶ 31     While Lowe contends that Donner's training was insufficient for him to be qualified as an expert, he fails to identify a specific national certification or specialized license that fingerprint comparison experts are expected to possess.  *Cf. id.* at 800 (defense witness testified that he was not recognized by the only national organization that recognizes qualified experts in the field of firearms

---

[6] Lowe does not argue that the scientific principles underlying the expert's testimony were not reliable, nor that the testimony was not helpful.  *See People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011).  Rather, he only argues that Donner was not qualified to opine on fingerprint comparison.

identification). Rather, Donner testified that he completed a sixteen-hour class with Saviano over a month-long period only five years earlier, and he had attended several informal training review classes since 2011. *Cf. id.* at 798 (defense witness's training consisted of only one course that he audited about twenty years prior to his testimony, he was unable to remember the name of the course or the instructor's name, he did not receive a grade in the course, and he could not remember taking any examinations in the course). These trainings allowed Donner to conduct at least seventy-three fingerprint comparisons, and he was previously qualified as an expert in fingerprint comparison thirteen times. *Cf. id.* at 799 (defense witness testified that he had previously been qualified as an expert in ten cases, but he also testified that the last time he was qualified as an expert in firearms identification was approximately five years before he testified in the present case). Donner also testified that after he does a fingerprint comparison, another person does an independent comparison to verify his finding, and he had never been advised that he had mismatched fingerprints. *Cf. id.* at 799 (defense witness admitted that no one supervised the comparisons he did).

¶ 32     Accordingly, it was well within the trial court's discretion to allow Donner to testify as an expert and to weigh that testimony. *See Golob,* 180 P.3d at 1011; *People in Interest of Strodtman,* 293 P.3d at 129-30.

### C.     Prior Escape Conviction

### 1.     Preservation and Standard of Review

¶ 33     Lowe preserved his contention that the trial court could not rely on a prior escape conviction in adjudicating Lowe a habitual criminal.  Regardless, a defendant may raise a claim that his sentence is unauthorized at any time.  *People v. Stellabotte,* 2016 COA 106, ¶ 42, *aff'd on other grounds,* 2018 CO 66.

¶ 34     We review the legality of Lowe's sentence de novo.  *See People v. Rice,* 2015 COA 168, ¶ 10; *see also People v. Phillips,* 2012 COA 176, ¶ 17 (we review a trial court's application of sentencing statutes de novo).

### 2.     Law and Analysis

¶ 35     The parties agree that the trial court erred by relying on Lowe's prior escape felony conviction in adjudicating him a habitual criminal.  *See* § 18-1.3-801(5), C.R.S. 2019 (A "prior conviction for escape, as described in section 18-8-208(1), (2), or (3)[, C.R.S.

2019,] . . . may not be used for the purpose of adjudicating a person an habitual criminal[.]"). However, the People argue that, while the trial court erred, no remand is necessary because the error was harmless. We disagree.

¶ 36    We recognize that Lowe would have been adjudicated a habitual criminal even without the prior escape conviction. The trial court found that the prosecution had proved beyond a reasonable doubt that Lowe had four other prior felony convictions, and section 18-1.3-801(2)(a)(I) only requires three prior convictions to be adjudged a habitual criminal. Nonetheless, because the plain language of section 18-1.3-801(5) explicitly forbids the use of a prior escape conviction to support a habitual criminal adjudication, we remand for correction of the mittimus to strike the reference to Lowe's prior escape conviction. Of course, the habitual adjudication and resulting sentence otherwise stands.[7]

---

[7] Count 12 was Lowe's prior felony escape conviction. The People asserted that Lowe had been convicted on October 22, 2007, in El Paso County, case number 2007CR2500, of escape in violation of section 18-8-208(3), C.R.S. 2019.

IV.    Multiplicity of Resisting Arrest Convictions

¶ 37    Lowe next argues that his two resisting arrest convictions should merge.  We agree.

A.    Preservation, Standard of Review, and Applicable Law

¶ 38    We review de novo a claim that a defendant's conviction violates his constitutional protection against double jeopardy. *People v. Arzabala*, 2012 COA 99, ¶ 19; *see also People v. Denhartog*, 2019 COA 23, ¶ 73 ("Whether convictions for different offenses merge is a question of law that we review de novo."). Because Lowe did not preserve this issue for appeal, we review his double jeopardy claim for plain error.  *See Reyna-Abarca v. People*, 2017 CO 15, ¶ 47.  But even when unpreserved, courts have generally concluded that when a defendant's double jeopardy rights have been violated, he is entitled to the appropriate relief on appeal. *Friend v. People*, 2018 CO 90, ¶ 45.

¶ 39    The United States and Colorado Constitutions protect an accused from being twice placed in jeopardy for the same crime. U.S. Const. amend. V; Colo. Const. art. II, § 18; *see also Arzabala*, ¶ 20.  Specifically, the Double Jeopardy Clauses protect defendants from multiplicity, meaning the charging of multiple counts and the

21

imposition of multiple punishments for the same criminal conduct. *Arzabala*, ¶ 20; *see also Denhartog*, ¶ 74 ("Multiplicity may arise 'where a defendant is charged with and convicted of multiple counts under a single criminal statute, and the statute does not create more than one offense but, rather, provides for alternative ways of committing the same offense.'" (quoting *People v. Barry*, 2015 COA 4, ¶ 95)). However, the Double Jeopardy Clauses do not prevent a defendant from being subjected to multiple punishments based upon the same criminal conduct as long as such punishments are "specifically authorized" by the General Assembly. *Patton v. People*, 35 P.3d 124, 129 (Colo. 2001) (citation omitted).

¶ 40 We determine whether multiple punishments are permissible by looking to the legislatively prescribed unit of prosecution. *People v. McMinn*, 2013 COA 94, ¶ 20. The unit of prosecution is the manner in which a criminal statute allows a defendant's conduct to be divided into discrete acts for purposes of prosecuting multiple offenses. *Id.* "To determine the unit of prosecution, we look exclusively to the statute." *Arzabala*, ¶ 23. In construing a statute, we must determine and effectuate the intent of the General

Assembly, which we discern when possible from the plain and ordinary meaning of the statutory language. *Id.*

¶ 41 A statute that prescribes a single unit of prosecution does not immunize a defendant from being punished separately for successive commissions of the same offense. *Friend*, ¶ 21. Accordingly, after identifying the unit of prosecution, we next examine the evidence to determine whether the defendant's conduct constituted factually distinct offenses. *McMinn*, ¶ 22; *see also* § 18-1-408(1)(e), C.R.S. 2019 (A defendant may not be convicted of more than one offense if the "offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods or instances of such conduct constitute separate offenses.").

¶ 42 In determining whether offenses are factually distinct, we look to all of the evidence introduced at trial and may consider (1) whether the acts occurred at different times and were separated by intervening events; (2) whether there were separate volitional acts in the defendant's course of conduct; and (3) factors such as temporal proximity, the location of the victim, the defendant's intent as indicated by his conduct and utterances, and the number of

victims. *McMinn,* ¶ 22. If we conclude that the convictions are not based on factually distinct offenses, then the convictions merge. *Id.* at ¶ 23.

¶ 43    As relevant here, a person commits resisting arrest when he knowingly "attempts to prevent a peace officer, acting under color of his official authority, from effecting an arrest" by

> (a) Using or threatening to use physical force or violence against the peace officer or another; or
>
> (b) Using any other means which creates a substantial risk of causing bodily injury to the peace officer or another.

§ 18-8-103(1), C.R.S. 2019.

## B.    Analysis

¶ 44    Lowe argues that his two resisting arrest convictions should merge because the unit of prosecution for resisting arrest is based upon the number of arrests that are resisted, not the number of officers present. Therefore, he reasons that because he only resisted a single arrest, the two resisting arrest convictions violate his constitutional protection against double jeopardy. We agree in part.

¶ 45     This appears to be an issue of first impression in Colorado. We agree with Lowe that the unit of prosecution for resisting arrest is not based on the number of victim-officers resisted.  However, we disagree that the unit of prosecution is based upon the number of arrests resisted.  Based on the plain language of the statute, *see* § 18-8-103(1); *Arzabala*, ¶ 23, we conclude that the unit of prosecution for resisting arrest is the number of *discrete volitional acts* of resisting arrest, *see McMinn*, ¶ 26 ("[T]he unit of prosecution for vehicular eluding must be defined not in terms of the number of officers involved, but in terms of discrete volitional acts of eluding that have endangered the public."); *Arzabala*, ¶ 26 ("Based on our interpretation of the plain language of the [leaving the scene of the accident resulting in serious bodily injury] statute, we conclude that the legislatively prescribed unit of prosecution is the number of accident scenes, not the number of victims involved in the accident."); *see also Purnell v. State*, 827 A.2d 68, 80 (Md. 2003) ("Having determined that the two resisting arrest counts charged by the State are the same for double jeopardy purposes and that the petitioner's conduct in resisting the officers' attempt to arrest him constituted one continuous act, we hold that the petitioner is guilty

of but one charge of resisting arrest, notwithstanding that there were two officers attempting to make the arrest.").

¶ 46 Accordingly, we must next determine whether Lowe's convictions are based on distinct volitional acts of resistance or whether his actions constituted one continuous act of resistance requiring his convictions to merge. *See McMinn*, ¶ 31 ("[W]e conclude that a defendant may be charged with multiple offenses of eluding a police officer arising from a single criminal episode when he or she has performed discrete acts of eluding, each constituting a new volitional departure in the defendant's course of conduct.").

¶ 47 When Lowe was charged with two counts of resisting arrest from the May 2015 altercation in Hobby Lobby, the prosecution alleged that Lowe knowingly prevented Mitchell and Duda from arresting him by using physical force. After reviewing the evidence presented at trial, *see id.* at ¶ 22, we cannot conclude that Lowe's actions can support two resisting arrest convictions. Rather, we conclude that Lowe's resistance was a continuous course of action to avoid a single arrest that did not end until he was shot by Mitchell. Because Lowe was never subdued, the attempt to arrest

him was never re-initiated. Therefore, we hold that the two resisting arrest convictions should merge. *See id.* at ¶ 23.

¶ 48    There was no intervening event during the arrest. The People contend that when Duda first sought to place Lowe in handcuffs and Lowe broke free, this action constituted an intervening event. But, we disagree given that Duda and Mitchell sought, at the same time, to effectuate one arrest. Instead, from Lowe's initial act of resistance, he continually refused to cooperate and resisted and was not subdued until the officers quickly escalated their use of force.

¶ 49    Our conclusion is further supported by the fact that the altercation occurred over a brief period of time at a single location. The officers initially attempted to arrest Lowe while he was speaking on the phone at a desk in the floral department, and he was later arrested in the same floral department, where the entire altercation occurred. *See id.* at ¶ 22; *cf. People v. Gingles*, 2014 COA 163, ¶ 42 ("Here, as in *McMinn*, the two counts of eluding involved separate offenses because they involved separate acts of eluding committed by defendant at different times and places. Defendant initially eluded both officers until, as in *McMinn*, only one of the two officers

27

could continue the pursuit. . . . Defendant's avoidance of the one deputy's attempt to stop him constituted a 'new volitional departure in the defendant's course of conduct,' separate from his earlier, initial act of eluding both of the deputies.").

¶ 50    Accordingly, we conclude that the trial court plainly erred by not merging Lowe's two resisting arrest convictions and remand for the trial court to amend the mittimus to reflect the merger of the resisting arrest convictions.

## V.    Consecutive Sentencing

¶ 51    Lowe last argues that the trial court erred when it found that consecutive sentencing was required for his two first degree assault convictions.  Rather, Lowe contends that the court retained its discretion to impose concurrent or consecutive sentences; therefore, a remand is required.  *See Rice*, ¶ 9 ("[W]hen the court misapprehends the scope of its discretion in imposing a sentence, the sentence must be vacated and the defendant must be re-sentenced using the correct range.").  We disagree.

### A.    Additional Background

¶ 52    Relying on the habitual criminal and crime of violence sentencing enhancers, the trial court imposed consecutive

sixty-four-year sentences for Lowe's first degree assault convictions. At the sentencing hearing, the trial court disagreed with Lowe's counsel that it was within the court's discretion to impose consecutive or concurrent sentences. Rather, the court found that consecutive sentencing was required because the convictions were based on separate crimes of violence:

> in the course of the incident, the evidence showed that [Lowe] separately struggled with each deputy, swung the knife at each of them, along with an additional incident where Lieutenant Mitchell described Lowe [as] still armed . . . [and as] "stalking his partner" before Lieutenant Mitchell fired his service weapon. Thus, the Court finds that these separately charged and brought and separately found verdicts of guilty arise out of the same incident requiring the Court to impose consecutive sentences pursuant to [section] 18-1.3-406.

¶ 53    Although the court found consecutive sentencing mandatory, it further noted that even if it could have exercised its discretion in sentencing, it nonetheless would have imposed consecutive sentences for Lowe's first degree assault convictions. The court stated,

> Due to the serious nature of these charges that law enforcement, in the attempt to perform their duties, which was execute an arrest

29

warrant for Mr. Lowe who was on escape status, were confronted quickly, aggressively by Mr. Lowe. . . . Lieutenant Mitchell testified that this was a nightmare experience in his 18 years of service with the El Paso County Sheriff's Department. He's only had seven arrests go as poorly and nearly deadly as this one did. So for purposes of appeal, even if a reviewing court were to disagree with the Court's analysis under [section] 18-1.3-406 that these incidents did qualify for mandatory consecutive sentencing as I found . . . due to the grave and serious nature of this offense committed against law enforcement officers, the Court does not find that concurrent sentences would be appropriate. It diminishes the seriousness of the offense. It diminishes the risk that law enforcement was placed in during the course of the performance of their duties.

## B. Preservation and Standard of Review

¶ 54    Although Lowe failed to object at sentencing on the grounds now raised on appeal, a defendant may raise a claim that his sentence is unauthorized by law at any time. *Stellabotte*, ¶ 42. We review the legality of Lowe's sentence de novo. *See Rice*, ¶ 10; *see also Phillips*, ¶ 17.

## C. Law and Analysis

¶ 55    First degree assault is a class 3 felony and subject to the crime of violence sentence enhancer, *see* § 18-3-202(2)(b)-(c), C.R.S. 2019,

which increases the presumptive sentencing range for a class 3 felony, *see* § 18-1.3-406(1)(a), C.R.S. 2019. Additionally, because Lowe's first degree assault convictions are class 3 felonies classified as crimes of violence, the extraordinary risk sentencing enhancer also applies; thus, the maximum sentence in the presumptive range was sixteen years. *See* § 18-1.3-401(10)(b)(XII), C.R.S. 2019. Finally, because the trial court found that Lowe had at least three previous felony convictions, he was adjudicated a habitual criminal pursuant to section 18-1.3-801, which provides a sentencing enhancer for a term of four times the maximum of the presumptive range, *see* § 18-1.3-801(2)(a)(I)(A). Accordingly, Lowe was sentenced to sixty-four years for each first degree assault conviction.

¶ 56 Lowe does not dispute that his first degree assault convictions are crimes of violence nor that they are considered extraordinary risk crimes, and he agrees that the trial court properly calculated sixty-four years as the appropriate sentence for his first degree assault convictions. However, he argues that the trial court erred when it found that consecutive sixty-four-year terms were mandatory. While Lowe acknowledges that the crime of violence statute mandates consecutive sentencing for separate crimes of

violence, *see* § 18-1.3-406(1)(a), he argues that the habitual criminal statute preempts the crime of violence statute, *see People v. Apodaca*, 58 P.3d 1126, 1131 (Colo. App. 2002) ("[T]he habitual criminal sentencing statute has been interpreted as preempting any otherwise applicable sentencing statute that would result in a less severe sentence[.]"); *People v. Hoefer*, 961 P.2d 563, 569 (Colo. App. 1998) ("[W]e conclude that the crime of violence sentencing provisions are inapplicable to persons, such as defendant, who are adjudicated as habitual criminals."). Because Lowe contends that section 18-1.3-406(1)(a), mandating consecutive sentencing for separate crimes of violence, was preempted by the habitual criminal statute, he argues that the trial court misapprehended whether it had discretion in sentencing and therefore a remand is necessary. *See Rice*, ¶ 9.

¶ 57    While we agree that *Apodaca* and *Hoefer* concluded that the habitual criminal statute preempted the crime of violence statute *in those cases*, we also recognize that their holdings were limited to ensure that the defendant served a longer sentence. *See Apodaca*, 58 P.3d at 1131 (The habitual criminal sentencing statute was "enacted for the purpose of increasing the punishment for repeat

32

offenders," and to be consistent with this purpose, the habitual criminal sentencing statute only preempts an "otherwise applicable sentencing statute that would result in a less severe sentence. . . . We are unaware of any decision interpreting the habitual criminal sentencing statute as establishing the maximum possible sentence where the defendant is also subject to sentencing under a second statute authorizing a greater maximum sentence. We decline to adopt such a construction in this case because it would flout the central purpose of the habitual criminal sentencing statute."); *Hoefer*, 961 P.2d at 569 (holding that the crime of violence statute was inapplicable to the defendant, who was also adjudicated a habitual criminal, because the habitual criminal sentence imposed three times the maximum sentence, whereas the crime of violence statute would only allow the defendant to be sentenced to not more than twice the maximum, which "would result in nonsensical results whereby those convicted of crimes of violence could avoid sentencing as habitual criminals").

¶ 58    Thus, *Apodaca* and *Hoefer* hold that the habitual criminal statute preempts the crime of violence statute *only* in regards to imposing the greater sentence on the defendant. Accordingly, Lowe

fails to identify Colorado law supporting his proposition that section 18-1.3-406(1)(a) is preempted when a defendant is also adjudicated a habitual criminal.[8] Indeed, previous divisions of this court have rejected similar arguments and instead held that the crime of violence statute's mandatory consecutive sentencing provision was not preempted by the habitual criminal statute. *See People v. Chavez*, 2020 COA 80, ¶ 13 ("The habitual criminal statute says nothing about whether multiple habitual criminal sentences should be imposed consecutively or concurrently. . . . Because the crime of violence statute's consecutive sentencing requirement does not conflict with the habitual criminal statute, we must give effect to both."); *People v. Pena*, 794 P.2d 1070, 1071-72 (Colo. App. 1990) (recognizing that while the habitual criminal statute preempts an otherwise applicable sentencing statute to ensure that a trial court may not impose a lesser sentence, the division concluded that "the preemptive scope of the habitual criminal statute does not extend so far as to preclude the mandatory consecutive sentencing requirement for *multiple* crimes of violence arising out of the same

---

[8] The habitual criminal statute is silent as to whether a court has discretion to, or must, impose consecutive or concurrent sentences.

34

incident"), *overruled on other grounds by Robles v. People*, 811 P.2d 804 (Colo. 1991). Given the habitual criminal statute's emphasis on increasing punishment, *see Apodaca*, 58 P.3d at 1131; *Hoefer*, 961 P.2d at 569; *see also Arzabala*, ¶ 23, we find *Pena* and *Chavez* persuasive and therefore reject Lowe's argument that the crime of violence mandatory consecutive sentencing provision is preempted by the habitual criminal statute.

¶ 59 We also agree with the trial court that consecutive sentencing was required under the crime of violence statute because Lowe's first degree assault convictions were separate crimes of violence that were not based on identical evidence.[9] *See* § 18-1.3-406(1)(a); *People v. O'Shaughnessy*, 275 P.3d 687, 697 (Colo. App. 2010) ("Crimes of violence are 'separate' if not based on identical

---

[9] We conclude that Lowe's actions can support only one resisting arrest conviction because his actions constituted a continuous act of resistance rather than factually distinct, volitional acts of resistance. We reached such a conclusion because Lowe's resistance occurred over a brief period of time, in a single location, with no intervening event. *See People v. McMinn*, 2013 COA 94, ¶ 22. But, we conclude that Lowe's actions were separate crimes of violence for purposes of his first degree assault convictions because we must consider his actions under a narrower standard: whether Lowe's first degree assault convictions, against different victims, were based on identical evidence.

35

evidence[.]"), *aff'd but criticized by* 2012 CO 9.  Because Lowe was convicted of separately threatening two different victims, we cannot conclude that the convictions were based on identical evidence.  *See People v. Espinoza,* 2020 CO 43, ¶ 21 ("[O]ffenses defined in terms of their victimization of another and committed against different victims are not capable of being proved by identical evidence[.]").

¶ 60    Thus, because we agree with the trial court that Lowe's first degree assault convictions were not based on identical evidence, and we conclude that the habitual criminal statute does not preempt section 18-1.3-406(1)(a), we hold that the trial court did not err in finding that consecutive sentencing was required.

## VI.    Correction of the Mittimus

¶ 61    The parties agree that Lowe's case should be remanded to correct the mittimus to reflect one sentence for counts 1 and 18, and one sentence for counts 2 and 19, because those counts merged.  The mittimus incorrectly reflects a sentence for each count.  We agree that the mittimus must be corrected to reflect the accurate sentence.

## VII. Conclusion

¶ 62    We remand to the trial court for it to disclose the specified parts of Mitchell's personnel and internal investigation files and to allow Lowe to attempt to make the requisite showing of prejudicial error.  If the trial court concludes there is a reasonable probability that the result of the trial would have been different, then it must grant Lowe a new trial; but, if the trial court finds no such reasonable probability exists, then it may leave in place its judgment of conviction, subject to Lowe's right to appeal.

¶ 63    We also remand so the trial court can amend the mittimus to reflect the merger of Lowe's resisting arrest convictions and to otherwise correct the mittimus as instructed.  We affirm the remaining judgments of conviction and sentence subject to the possibility of a new trial.

JUDGE BROWN and JUDGE ROTHENBERG concur.