22CA1366 Peo v Rigg 10-23-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1366
Weld County District Court No. 10CR619
Honorable Allison J. Esser, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Daniel Rigg,

Defendant-Appellant.

---

ORDER AFFIRMED

Division V
Opinion by JUDGE PAWAR
Freyre and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 23, 2025

---

Philip J. Weiser, Attorney General, Wendy J. Ritz, First Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Daniel Rigg, appeals the trial court's denial of his motion for a new trial after he was convicted of sexual assault on a child by one in a position of trust as part of a pattern of abuse, aggravated incest, two counts of sexual exploitation of a child, and solicitation to commit tampering with evidence.  We affirm.

## I.     Background

¶ 2     The factual and procedural background of this case is described in detail in two prior opinions from this court.  *See People v. Rigg*, (Colo. App. No. 11CA1033, Feb. 26, 2015) (not published pursuant to C.A.R. 35(f)) (*Rigg I*); *People v. Rigg*, (Colo. App. No. 17CA1303, Dec. 17, 2020) (not published pursuant to C.A.R. 35(e)) (*Rigg II*).  As pertinent to this appeal, Rigg was charged with and convicted of multiple offenses involving an inappropriate sexual relationship he had with his adopted daughter, T.R., when she was between the ages of eleven and fifteen.  While the case was pending, T.R. participated in three forensic interviews with police.  During the first two interviews, she denied any sexual contact with Rigg.  Between the second and third interviews, she began mandatory therapy.  Then, during the third forensic interview, T.R. made detailed allegations against Rigg.

¶ 3     Before trial, Rigg sought disclosure of T.R.'s therapy records and requested that the trial court review them in camera. Concluding that T.R. had not waived her psychologist-patient privilege, the court declined to review the records and excluded them from evidence.

¶ 4     The case proceeded to trial, where T.R. testified that Rigg sexually assaulted her, used sex toys on her, took explicit photographs of her, wrote her love letters, and hid evidence of their affair in a safe. The prosecution presented further evidence of the letters, photographs, and sex toys, as well as school absence and hotel records and additional testimony suggesting that Rigg asked others to destroy evidence of his relationship with T.R.

¶ 5     The defense sought to discredit T.R.'s account, arguing that T.R. fabricated the allegations after beginning therapy because she wanted to return to her mother's custody and regain cell phone and internet privileges.

¶ 6     The jury convicted Rigg of all but one of the charged offenses, and the trial court sentenced him accordingly.

¶ 7     Following Rigg's direct appeal and two subsequent remands in *Rigg I* and *Rigg II*, the trial court conducted an in camera review of

the therapy records, determined they were discoverable, and disclosed them to the parties. Rigg then filed a motion for a new trial based on the exclusion of the therapy records. In an oral ruling, the trial court identified three new pieces of information from the records that had not been available to the defense before trial:

1. the exact date T.R. began therapy: April 21, 2010;

2. T.R.'s response on her intake form regarding what she hoped to accomplish in therapy: "I want to get to stay with my mom again"; and

3. a checkmark on the intake form, made by an unidentified individual, indicating that "lying" was among their concerns about T.R.

Considering each of these pieces of information, the theory of defense, and the evidence introduced at trial, the court concluded that the undisclosed records would not have undermined T.R.'s credibility or changed the outcome of Rigg's trial. It therefore denied Rigg's motion for a new trial.

¶ 8     Rigg appeals, arguing that the trial court misapplied the law and underestimated the impact T.R.'s therapy records would have had on his defense.  We disagree with both arguments.

## II.     Applicable Law

¶ 9     When a trial court conducts an in camera review of previously undisclosed evidence and determines the evidence should have been disclosed to the parties, it must give the defendant an opportunity to demonstrate a reasonable probability that, had the documents been disclosed before trial, the result of the proceeding would have been different.  *See Zoll v. People*, 2018 CO 70, ¶ 12.

¶ 10    A "reasonable probability" means a probability sufficient to undermine confidence in the outcome.  *People v. Bueno*, 2018 CO 4, ¶ 32 (in the context of *Brady* violations, we consider the materiality of undisclosed evidence collectively, rather than individually).

¶ 11    We review a trial court's decision to grant or deny a defendant's motion for a new trial for an abuse of discretion.  *People v. Burke*, 2018 COA 166, ¶ 6.  A court abuses its discretion if its decision is manifestly unreasonable, arbitrary, or unfair, or if it misapplies the law.  *Id.*

## III. Discussion

### A. The Court Applied the Correct Legal Standard

¶ 12    Rigg argues the trial court misapplied the law in two ways. First, he argues the court improperly placed the burden of proving prejudice on him. He asserts that under *James v. People*, 2018 CO 72, ¶ 18, the prosecution bears the burden of proving the absence of prejudice. Rigg is mistaken.

¶ 13    In *Zoll*, our supreme court made clear that "[i]t is the defendant's burden to show prejudice as a result of a trial court's erroneous nondisclosure" of evidence. *Zoll*, ¶ 11 (adopting the approach in *People in Interest of A.D.T.*, 232 P.3d 313 (Colo. App. 2010)). Rigg argues *Zoll* and *A.D.T.* are distinguishable because they were based on case law involving discovery violations. But *Zoll* involved the same issue presented here — the proper remedy when a court erroneously fails to disclose evidence to the defense. By contrast, *James* involved the burden of proving harmlessness in the context of appellate review. *See James*, ¶ 18 (discussing "a specific burden to persuade *an appellate court* of harmfulness or harmlessness" (emphasis added)). We therefore conclude that the standard articulated in *Zoll* controls, and *James* is inapposite.

¶ 14    Second, Rigg argues the trial court erred by evaluating whether the newly discovered evidence would have produced an acquittal, rather than any different result.  But the court did not apply such a narrow standard.  Instead, the trial court stated that it was considering whether, "had the documents been disclosed before the trial, the result of the proceeding would have been different or Mr. Rigg would have been acquitted."  This demonstrates that the court did not require T.R.'s therapy records to result in an acquittal but recognized that an acquittal was one of the possible outcomes. The court then considered the effect of T.R.'s therapy records under the correct standard and found that the result of the proceeding would not have been different even if the records had been admitted.  Accordingly, we conclude the court correctly applied the law.

B.    No Reasonable Probability of a Different Result

¶ 15    Next, Rigg asserts that he is entitled to a new trial because earlier disclosure of the records would have provided substantial evidence to corroborate his theory of defense and otherwise affected the outcome.  Because we conclude that the new evidence was

6

largely cumulative of other evidence introduced at trial, we are not persuaded.

¶ 16    As discussed, the undisclosed therapy records included the date T.R. started therapy, her desire to return to her mother's custody, and a checkmark by an unidentified individual indicating they were concerned about her truthfulness.  Rigg argues he would have used this evidence to impeach T.R.'s credibility in a case that entirely hinged on whom the jury believed.  He further argues that earlier access to this evidence would have strengthened his attempt to exclude T.R.'s third forensic interview as unreliable child hearsay and enabled him to call T.R.'s therapist as a witness.

¶ 17    Although the precise date T.R. began therapy was not introduced at trial, the jury heard — and defense counsel emphasized — evidence that she began therapy between the second and third forensic interviews and that T.R.'s therapist initiated the third interview.  The jury also heard evidence that, before T.R.'s initial outcry, she wrote in her journal expressing surprise that anyone would think she had been sexually assaulted.  Defense counsel used this evidence in closing argument to claim that T.R.'s

therapist "coached" her "to change the story she put in her private [diary] into something completely different."

¶ 18    Likewise, although T.R. never directly testified that she started therapy to return to her mother's custody, the record supports the trial court's finding that T.R. wanted to go home.  T.R. testified that by the time of the third forensic interview, she had "been taken away from [her] mother," removed from her home, and prohibited from using cell phones or computers.  She further confirmed that, at that point, "it was becoming clear that [she was] not going to just get to go back and be with [her] mom."  The jury could also infer T.R.'s desire to return to her mother's custody from the recording of the second forensic interview, in which T.R. asked whether she could go home and started crying when the detective said she didn't know.  Using this evidence, defense counsel argued in closing that T.R. changed her story because she was "no longer the free . . . teenager she used to be," it was "becoming increasingly clear . . . that the current strategy of telling the truth [wasn't] getting her anywhere," and she needed to "tell them what they want[ed] to hear."

¶ 19    As to the checkmark next to "lying" on the intake form, the trial court properly determined that Rigg failed to demonstrate this evidence was admissible in the first instance, let alone that it would have changed the outcome of trial. It was unclear who marked this box or whether T.R. was aware of it. Moreover, as the trial court observed, evidence that people were concerned about T.R. lying after her first and second forensic interviews cut both ways — arguably to the prosecution's advantage. True, defense counsel might have used this evidence to argue that people in T.R.'s life were pressuring her to change her story. But the jury could have also inferred from this evidence that T.R. had been lying in her first two forensic interviews, when she denied sexual assault. We therefore conclude that, like the other details in the therapy

records, this evidence did not create a reasonable probability of a different outcome.[1]

¶ 20     We recognize that this case hinged to some degree on T.R.'s credibility.  But we disagree with Rigg that any new evidence that may have cast doubt on her credibility warrants a new trial.  *See Bueno*, ¶ 32 (instead, the question is whether there is a probability of a different result sufficient to undermine confidence in the outcome).  In addition to the new evidence being largely cumulative, other evidence at trial corroborated T.R.'s testimony and supported the jury's verdicts.  The prosecution introduced evidence that Rigg had explicit photographs of T.R. in his possession, kept her sex toys in his safe, wrote her love letters, took her out of school and later checked into hotels, was overheard by T.R.'s brother having sex

---

[1] For the first time in his opening brief, Rigg points to additional details in the therapy records that would have been useful to him at trial, including the use of eye movement desensitization and reprocessing therapy, suggestion that T.R. spend time with other victims of sexual assault, and discussion about how T.R. would testify.  Rigg did not include these details in his motion for a new trial, so reversal is not warranted in the absence of plain error.  *See Hagos v. People*, 2012 CO 63, ¶ 14.  Because Rigg was nevertheless able to argue at trial that T.R. had been coached and, as discussed below, ample additional evidence supported T.R.'s credibility, we conclude the failure to disclose this evidence before trial does not cast serious doubt on the reliability of his convictions.  *See id.*

with T.R., and asked others to destroy physical evidence found in the safe.[2] Viewing this evidence together, we conclude the trial court properly determined there was no reasonable probability of a different outcome at Rigg's trial.

## C.    Rigg's Remaining Arguments

¶ 21    Finally, we decline to address Rigg's remaining arguments because they are undeveloped. Although he argues that T.R.'s therapy records cast doubt on the reliability of her out-of-court statements, he fails to explain how the details included therein — the date she began therapy, her reason for starting therapy, and the unidentified checkmark — would have changed the court's determination that her statements were reliable and admissible. Likewise, Rigg argues that access to the full records would have enabled the defense to call T.R.'s therapist as a witness. But he makes no argument about why the records would have allowed him

---

[2] It also presented DNA evidence taken from the sex toys. While Rigg points to ongoing investigations against the prosecution's DNA expert to cast doubt on the reliability of this, he did not base his motion for a new trial on any new evidence resulting from these investigations. In any event, we conclude that even without the DNA evidence, the new evidence in T.R.'s therapy records was insufficient to undermine confidence in the jury's verdicts.

11

to call the therapist or how her testimony would have changed the outcome of his trial. Because these arguments are not developed, we do not consider them. *See People v. Relaford*, 2016 COA 99, ¶ 70 n.2.

## IV. Disposition

¶ 22 The order is affirmed.

JUDGE FREYRE and JUDGE YUN concur.